This case involves a contest between a payor (AmSouth Mortgage Company, Inc.) and the beneficiary of the payment (Madelaine B. Stewart) wherein AmSouth seeks, under equitable principles, repayment of the moneys it paid to satisfy a debt of Stewart.
The following statement of pertinent, undisputed facts is taken from the opinion of the Court of Civil Appeals:
 "In August 1992, Madelaine Stewart ('the mother') bought a house for the use and benefit of her daughter, Linda Stewart Sanders ('the daughter'), who was going through divorce proceedings. The mother paid an equity amount of $6,786 and assumed an existing mortgage in favor of Wachovia Mortgage Company. The *Page 253 
daughter lived in the house and made the monthly mortgage payments to Wachovia.
 "In the spring of 1993, the daughter applied for a loan from AmSouth Mortgage Company to refinance the mortgage indebtedness at a lower interest rate. The daughter told the AmSouth loan officer that the title to the house was in her mother's name[, explaining] to the loan officer[:]
 " '[A]t the time of the divorce . . . [she] was unable to qualify for a mortgage and . . . her mother had purchased this home with the understanding that as soon as [the daughter] could qualify, . . . [the daughter] would refinance the home and put the mortgage in her own name.'
 "The loan officer informed the daughter that the property 'would need to be deeded into [the daughter's name] in order to refinance it and pay off her mother's mortgage.'
 "In May 1993, the mother executed a warranty deed conveying title to herself and her daughter 'for and during their joint lives and upon the death of either of them, then to the survivor of them in fee simple.' The deed was properly recorded on May 18, 1993.
 "The daughter gave the loan officer a copy of the deed. At trial, the loan officer admitted that she saw the deed and that she was 'aware of the fact before [she] made this mortgage to [the daughter] that the house was jointly owned by [the mother] and [the daughter].'
 "In June 1993, the mother and the daughter went to the office of AmSouth's lawyer to close the loan. The lawyer explained to the mother that the proceeds of the AmSouth loan would be used to pay off the mother's mortgage to Wachovia. The mother reviewed all the documents and asked AmSouth's lawyer if there were any papers for her to sign. The lawyer told her that she did not need to sign anything. The daughter alone signed the note and mortgage.
 "At trial, the AmSouth lawyer testified that, at the time of the closing, AmSouth had not furnished him with the deed and he was not aware that the mother and the daughter owned the property jointly. He further explained:
 " '. . . I did know from AmSouth that the deed was to be conveyed from [the mother] to her daughter. . . . So when this particular loan came up on that given day the abstract had not come back to me. I called the abstract [company] and got what I commonly call "a verbal," which is done by one of my real estate secretaries. They came back and said . . . "there are no liens or judgments on the property." Unfortunately, I presumed the deed had been transferred and strictly into [the daughter's] name and not knowing that we did not request that [the mother] sign the mortgage. If I had seen the abstract and if I had seen the deed then I would have had to insist [that the mother] sign the mortgage. . . .'
 "Less than one month after the closing, the daughter died.
 "Claiming to be the owner of an undivided one-half interest in the property as a tenant in common . . . the mother filed a complaint for sale for division of the proceeds. [AmSouth counterclaimed, seeking, under an unjust enrichment theory, to recover certain moneys it had paid for the mother's benefit.]
 "The court ruled that the mother was the sole owner of the property, subject to a mortgage in favor of AmSouth. It determined that 'AmSouth, by virtue of paying in full the first mortgage [to Wachovia], was subrogated to all the rights and privileges of the holder of the . . . first mortgage [to the extent of its payment of $84,201.71, plus interest].' The mother appealed. . . ."
Stewart v. AmSouth Mortgage Co., 679 So.2d 247, 248-49
(Ala.Civ.App. 1995).
The Court of Civil Appeals reversed the trial court's holding that AmSouth was equitably entitled to a security interest in the entire piece of property in question. The Court of Civil Appeals based its decision on its determination that parties who are culpably negligent are not entitled to relief under a quasi-contract or unjust enrichment theory *Page 254 
— that is, that "the equitable doctrines that might, under other circumstances, afford relief are unavailable here because of AmSouth's culpable neglect and the mother's freedom from fault." 679 So.2d at 251. The Court of Civil Appeals also reversed the trial court's holding that the mother was the sole owner of the property, which she had held with her deceased daughter pursuant to a deed creating a joint tenancy with right of survivorship. According to the Court of Civil Appeals, when the daughter mortgaged the property, she severed the joint tenancy, destroyed the survivorship provision, and created a new tenancy, from which both the mother and the daughter acquired an undivided one-half interest in the property as tenants in common, with only the daughter's interest being subject to the AmSouth mortgage.
Neither party sought certiorari review of the second holding. Rather, only AmSouth sought certiorari review, and only on the issue whether it was equitably entitled to a security interest in the entire piece of property in question — that is, the issue whether AmSouth's negligence in failing to discover that the mother was co-owner of the property with her daughter and to have the mother sign the mortgage on the property prevents the application of the traditional equitable remedies of restitution or subrogation that would enable AmSouth to recover the $84,201.71 it paid to Wachovia with the mother's knowledge and for the benefit of the mother.
Although AmSouth concedes that the closing attorney was negligent and that his negligence resulted in his failure to discover that the deed did not convey the entire title to the daughter, AmSouth nonetheless contends that, in this case, the attorney's negligence does not bar the application of the doctrine of equitable subrogation based upon a "money had and received theory" and does not justify conferring upon the mother the windfall it says she seeks.[1]
The mother relies on the following statement as governing in cases that involve equitable lien principles:
 "[A] court is authorized to exercise its equity power to impress a lien upon real property as security for a debt only where the person against whose interest the lien is declared and enforced is guilty of some wrongdoing in procuring the loan or service by which the debt is created. Our cases make clear that, whether the equitable grounds essential to give the 'equitable lien' principle a field of operation are expressed in terms of 'fraud,' 'unclean hands,' or 'unjust enrichment' mere passive conduct on the part of the party against whose interest the lien sought is not sufficient."
Costanza v. Costanza, 346 So.2d 1133, 1136 (Ala. 1977), quoted with approval in Lewis v. Johnson, 507 So.2d 918 (Ala. 1987);Azalea City Motels, Inc. v. First Alabama Bank of Mobile,551 So.2d 967 (Ala. 1989). The mother also maintains that to be entitled to equitable subrogation, the lender must have been ignorant of the intervening lien. She also maintains that there was no intervening equitable lien, because, she says, equitable liens can arise under Alabama law only when improvements or expenditures are made in good faith and under mistake as to title and cannot arise where expenditures are made with knowledge of the real or true state of the title. The mother also contends that because AmSouth knowingly accepted a mortgage from her daughter based on her credit and her qualifications, AmSouth is not entitled to an equitable lien. The evidence, at most, the mother insists, showed only passive conduct on the part of the mother, which, she says, is insufficient under Alabama law to justify the imposition of an equitable lien.
AmSouth argues that the cases relied on by the Court of Civil Appeals to support its holding that "culpable negligence" disqualifies a party from obtaining equitable relief are distinguishable, correctly pointing out that those cases involved innocent third parties who would have been harmed if the negligent plaintiff had obtained the relief sought. AmSouth also points out that the cited cases are not "money had and received" cases or cases seeking equitable liens upon a *Page 255 
"money had and received" theory, but instead are cases involving bona fide improvers of land. We agree with AmSouth that the cases relied upon by the Court of Civil Appeals should not be applied to bar equitable relief under the particular facts of this case. Both of the cases the Court of Civil Appeals cited as establishing a general "culpable negligence" bar to equitable relief, Manning v. Wingo, 577 So.2d 865
(Ala. 1991), and Gresham v. Ware, 79 Ala. 192 (1885), involved efforts to recover costs of substantial improvements to land made by parties who thought that they had good title to the property when they made the improvements. Interestingly, though, in Manning, 577 So.2d at 869, this Court, after denying any relief based upon traditional equitable remedies, granted relief to the improving party based upon a "balancing of the equities" theory:
 "The Wingos would not be entitled to recover for the improvements under any of those situations; however, based on the circumstances of this case and balancing the equities involved under these facts, we hold that the Wingos are entitled to recover the value of their improvements."
The law of restitution was created with the purpose and design of forcing a defendant to return benefits that it would be unjust to allow the defendant to keep; the law of restitution is not intended to compensate the plaintiff. Recovery for "money had and received" is one of the principal categories of restitution. See Davis, Tilley's Alabama Equity, §§ 12-1 and 12-2, p. 277-79 (3d ed. 1994).
 "[T]he plaintiff has a restitution action for money had and received whenever the defendant holds money [or other pecuniary gain] which in equity and good conscience belongs to the plaintiff or was improperly paid to [or on behalf of] the defendant because of mistake or fraud.
". . . .
 "If the plaintiff makes a voluntary payment to a third party for the defendant's benefit, there is no right of action in money had and received against the defendant unless [the defendant] has ratified the payment, or initially caused the payment to be made. A claim for money paid is insufficient without proof that the money was paid for the defendant at his request, express or implied, or that the payment was subsequently ratified."
Id., at 277-78, citing Murphree Ins. Agency v. Pinnington,201 Ala. 500, 78 So. 854 (1918), and Blackwood v. Rutherford,212 Ala. 630, 103 So. 689 (1925). (Emphasis added.)
If this is not a case where there was at least an "implied request" on the part of the defendant that the plaintiff pay her debt, then there probably could never be such a case. The mother was present at the closing, and she asked AmSouth's attorney if it was necessary for her to sign the papers. Obviously, the mother was interested in getting her debt to Wachovia paid off and fully consented to that payment.
The "culpable neglect" the Court of Civil Appeals found consisted solely of AmSouth's lawyer's failure to look at the deed before the closing. There was no culpability associated with this failure. This act of simple negligence was not intended to harm the mother, nor did it harm her; and it did not confer a benefit on AmSouth. Rather, it was the mother's actions taken in an attempt to benefit from AmSouth's mistake that caused this controversy.
If all persons who negligently confer an economic benefit upon another are disqualified from equitable relief because of their negligence, then the law of restitution, which was conceived in order to prevent unjust enrichment, would be of little or no value. However, it is uniformly accepted by courts throughout this country that a payor's negligence in the payor-versus-beneficiary situation does not disqualify the payor from obtaining equitable relief unless the beneficiary has been damaged by the payor's negligence. See Restatement ofthe Law of Restitution, § 59, p. 232 (1937):
 "A person who has conferred a benefit upon another by mistake is not precluded from maintaining an action for restitution by the fact that the mistake was due to his lack of care."
The comments to § 59 state:
 "a. The fact that the transferor fell below the standard of a reasonable man in *Page 256 
ascertaining facts or in drawing inferences from facts, whether or not his failure was with respect to his own interests, those of the payee or those of third persons, is normally not decisive and does not prevent him from obtaining restitution. This is so because one is not penalized for lack of care unless this results in harm to someone else, and restitution is allowed because of mistake only to the extent that benefits have been received by one at the expense of the other."
See, Douthwaite, Attorney's Guide to Restitution (1977), § 9.1, "Defenses," p. 361; Palmer, The Law of Restitution, vol. III, § 16.3, "The Effect of Negligence," pp. 462-63. A contrary result "would be curious indeed." Palmer, The Law of Restitution, at 462-63. The mother suffered no harm or damage as the result of AmSouth's negligence; it would be inequitable to allow her to retain the benefit of the payment.
In denying AmSouth's request for equitable relief, the Court of Civil Appeals confused the law of restitution with our law dealing with one's good-faith improvements to another's land and, therefore, erroneously allowed the mother to assert AmSouth's carelessness as a justification for retaining the benefit conferred upon her. We reverse the judgment of the Court of Civil Appeals and remand the case for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY, INGRAM, and COOK, JJ., concur.
BUTTS, J., concurs in the result.
[1] In Count I of its counterclaim, AmSouth specifically alleges that the mother "owes AmSouth $84,201.71 for money had and received . . . paid by AmSouth [to Wachovia] for the benefit of [the mother]."