74 A.3d 1

SOVEREIGN BANK, PLAINTIFF–RESPONDENT, v. JOSEPH M. GILLIS; MRS. JOSEPH M. GILLIS, HIS WIFE; EULALIA GILLIS; MR. GILLIS, HUSBAND OF EULALIA GILLIS; FIRST BANKAMERICANO; AND STATE OF NEW JERSEY, DEFENDANTS, AND DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR WAMU MORTGAGE PASS THROUGH CERTIFICATES, WAMU 2005–AR9, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 15, 2013—Decided July 3, 2013.

Before Judges PARRILLO, SABATINO and MAVEN.

*Robert L. Grundlock, Jr.*, argued the cause for appellant (*Rubin Ehrlich & Buckley, PC*, attorneys; *Mr. Grundlock*, on the briefs).

*Vladimir Palma* argued the cause for respondent (*Phelan Hallinan & Diamond*, attorneys; *Mr. Palma*, on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

This appeal concerns whether a refinancing lender that discharges its own previous mortgage and issues another mortgage loan for a higher amount, and which simultaneously pays off the balance owed on a junior lienor's line of credit without having it closed, can rely upon equitable principles to maintain its priority

over that junior lienor. This question of priority arises here in a context in which the borrowers, after obtaining the refinancing, drew additional funds on the line of credit and then defaulted on both the refinanced mortgage loan and the line of credit.

Applying principles of replacement and modification recognized in the *Restatement (Third) of Property—Mortgages* (1997) ("the *Third Restatement*"), we reverse the trial court's decision allowing the junior lienor that extended the line of credit to vault over the priority of the refinancing mortgage lender. We consequently direct the trial court, on remand, to determine the proper extent of the refinancing lender's priority, in an amount that avoids material prejudice to the junior lienor.

## I.

The essential facts are substantially undisputed. On May 28, 1998, defendants Joseph and Eulalia Gillis ("the Gillises")[1] borrowed $650,000 from Washington Mutual Bank, FA ("WaMu") to finance the purchase of a residential property in Warren Township. The mortgage loan had a thirty-year term through June 2028, with an adjustable interest rate initially set at 6.625%. WaMu secured the May 1998 loan with a purchase-money mortgage, which was recorded in the first position of priority.

Subsequently, in December 1998, the Gillises obtained a home-equity line of credit from Broad National Bank, secured by a mortgage recorded in the second position.[2] In October 2001, the Gillises obtained additional funding from Crown Bank, NA ("Crown"), secured by a mortgage recorded in the third position.

---

[1] The Gillises, the defaulting debtors, have not participated in this appeal, which centers upon which of their respective lenders has priority for purposes of foreclosure.

[2] A line of credit permits a borrower to draw money from a lender through an open-ended credit reserve, subject to certain covenants contained within the credit agreement, respecting such matters as the credit limit, interest rate, and the terms of repayment.

On March 18, 2003, the Gillises obtained yet another home-equity line of credit, this time from Independence Community Bank ("Independence"), for the sum of $500,000, also secured by a mortgage. As a condition of closing, Independence required that the proceeds from the funds borrowed on the line of credit be used to discharge the two preexisting debts that the Gillises held with Broad and Crown. The amount remaining after the discharge (i.e., $58,252.58) was applied to pay down a portion of the outstanding purchase-money mortgage with WaMu, which at the time had a principal balance of about $534,000. Both the Broad and Crown mortgages were discharged shortly thereafter the payoff. Consequently, the March 18, 2003 line of credit with Independence stood in a second lien position behind the May 1998 WaMu purchase-money mortgage.

In January 2005, the Gillises sought to refinance their existing mortgage loans. To that end, they borrowed $1.19 million from WaMu, secured by another mortgage on their property ("the WaMu refinanced mortgage") dated January 13, 2005. The WaMu refinanced mortgage loan had a thirty-year term through February 2035, with an adjustable interest rate initially set at 4.027%.[3] The WaMu refinanced mortgage was recorded on January 31, 2005. The principal amount from this refinancing was used to pay off the Gillises' remaining debt of $482,023.67 that the original May 1998 WaMu purchase-money mortgage secured, as well as the remaining debt of $499,921.93 that the Independence line of credit mortgage secured.

The parties agree the $499,921.93 advanced to Independence stemming from the January 13, 2005 WaMu refinancing paid off the Independence debt in full. Independence memorialized the receipt of this sum in a payoff letter that it issued to WaMu, listing an effective date of January 14, 2005. Significantly, at the bottom of the payoff letter, Independence noted in bold and

---

[3] The last digit is not entirely clear in the photocopied appendix.

underlined type, "We require all customers to sign an authorization to close a line of credit."

For reasons that are not clear from the appellate record, WaMu failed to obtain written authorization from the Gillises to close out the Independence line of credit. Consequently, the mortgage on that line of credit was not discharged of record, despite an alleged intent to do so. The WaMu refinanced mortgage was instead recorded behind the Independence line of credit mortgage, which remained a lien of record even though the balance on that loan existing at the time of the January 2005 refinancing had been paid off by WaMu in full.

Thereafter, the Gillises continued to borrow funds under the Independence line of credit, starting on February 14, 2005 and continuing at least until August 15, 2006. Ultimately, however, the Gillises defaulted on both the WaMu refinanced mortgage loan and the Independence line of credit.

Pursuant to a January 2010 assignment, appellant Deutsche Bank National Trust Company ("Deutsche Bank") began holding the WaMu refinanced mortgage as the Trustee for WaMu Mortgage Pass Through Certificates, WAMU 2005–AR9. In addition, the mortgage on the Independence line of credit was assigned to respondent Sovereign Bank ("Sovereign").[4]

In January 2010, Deutsche filed a foreclosure action in the Chancery Division against the Gillises on the defaulted WaMu refinanced mortgage.[5] Sovereign likewise filed a foreclosure action in the Chancery Division in October 2010 on the defaulted line

---

[4] The respective assignments to Deutsche and Sovereign are not challenged on appeal.

[5] The Gillises had filed a contesting answer, but did not participate in the motion briefing below. Sovereign obtained summary judgment against the Gillises dismissing their answer, but the Gillises filed a reinstatement motion during the pendency of this appeal. The outcome of the litigation as it relates to the Gillises has not been indicated to us, and it does not affect our analysis of the priority issues.

of credit. The trial court jointly managed the two foreclosure actions, but did not consolidate them. Consequently, the parties litigated their dispute under the caption of Sovereign Bank's foreclosure action.

Deutsche moved for summary judgment against Sovereign, arguing that, based upon equitable principles, the WaMu refinanced mortgage loan had priority over the Independence line of credit. Deutsche argued that the WaMu refinanced mortgage should be granted priority over the Independence line of credit mortgage under the doctrine of equitable subrogation because the debt on the line of credit existing at the time of the refinancing had been paid in full and was, in any case, intended to be discharged.

Sovereign cross-moved for summary judgment against Deutsche, conversely maintaining that the Independence line of credit, which had been recorded first, had priority over the WaMu refinanced mortgage loan. Among other things, Sovereign argued that the doctrine of equitable subrogation cannot be invoked to give the WaMu refinanced mortgage priority over the Independence line of credit because WaMu had actual knowledge of that pre-existing and recorded line of credit when the refinancing occurred. Sovereign further argued that because the line of credit had not been properly closed and that because the Gillises had subsequently withdrawn additional funds on it, the Independence mortgage should instead maintain priority over the WaMu refinanced mortgage.

■ Upon considering the lenders' competing arguments, the trial court granted summary judgment to Sovereign and held that the Independence line of credit has priority over the WaMu refinanced mortgage. In its written decision, the court applied case law instructing that a new mortgagee is not entitled to equitable subrogation if it "possesses actual knowledge of the prior encumbrance." *First Union Nat'l Bank v. Nelkin,* 354 *N.J.Super.* 557, 565–66, 808 *A.*2d 856 (App.Div.2002). Because WaMu obviously had such actual knowledge of the Independence

line of credit when it paid off the balance on that loan in January 2005 as part of the refinancing, the court concluded that WaMu could not equitably maintain any priority over the Independence loan.

On appeal, Deutsche urges that we reverse the trial court and grant it an equitable remedy of priority, despite WaMu's admitted awareness of the Independence loan at the time of the refinancing. Deutsche contends that the "actual knowledge" exception recognized in *Nelkin* and other case law, at least as applied in these circumstances, unfairly bestows a windfall upon the original junior lienor, Independence, and its assignee, Sovereign. Deutsche argues that the actual knowledge principle wrongfully penalizes a refinancing lender such as WaMu that knowingly pays down a junior debt in full.

As part of its arguments, Deutsche relies upon principles of equity set forth in the *Third Restatement*, including comment (e) to Section 7.6, which states that "where a mortgage loan is refinanced by the same lender, a mortgage securing the new loan may be given the priority of the original mortgage under the principles of replacement and modification of mortgages." Because we endorse that approach, we reverse the trial court's decision and remand for further proceedings to determine the appropriate extent of appellant's priority.

## II.

Mortgage priorities are generally governed in New Jersey by our recording statutes. *N.J.S.A.* 46:26A–1 to –12. New Jersey is a "race-notice" jurisdiction, meaning that when two parties are competing for priority over each other's mortgage, the party that recorded its mortgage first will normally prevail, so long as that party did not have actual knowledge of the other party's previously-acquired interest. *Cox v. RKA Corp.*, 164 *N.J.* 487, 496, 753 *A.*2d 1112 (2000) (citing *Palamarg Realty Co. v. Rehac*, 80 *N.J.* 446, 454, 404 *A.*2d 21 (1979)). Lenders and other parties are generally charged with constructive notice of instru-

ments that are properly recorded. *Id.* (citing *Friendship Manor, Inc. v. Greiman,* 244 *N.J.Super.* 104, 108, 581 *A.2d* 893 (App.Div. 1990) (noting that "[i]n the context of the race[-]notice statute, constructive notice arises from the obligation of a claimant of a property interest to make reasonable and diligent inquiry as to existing claims or rights in and to real estate"), *certif. denied,* 126 *N.J.* 321, 598 *A.2d* 881 (1991)). Consequently, a mortgagee that properly records its mortgage generally maintains its priority against subsequent mortgagees, even if those mortgagees did not have actual knowledge of the first recorded mortgage. *See Third Restatement* § 7.1 (observing that, ordinarily, "[a] valid foreclosure of a mortgage terminates all interests in the foreclosed real estate that are junior to the mortgage being foreclosed and whose holders are properly joined or notified under applicable law"). These general propositions, however, are subject to certain equitable considerations.

An exception to the normal "race-notice" determination of mortgage priorities can sometimes occur when a third party advances money to pay off a mortgage. *See, e.g., Metrobank for Sav., FSB v. Nat'l Cmty. Bank,* 262 *N.J.Super.* 133, 143–44, 620 *A.2d* 433 (App.Div.1993); *Trus Joist Corp. v. Nat'l Union Fire Insurance Co.,* 190 *N.J.Super.* 168, 179, 462 *A.2d* 603 (App.Div. 1983), *rev'd on other grounds,* 97 *N.J.* 22, 477 *A.2d* 817 (1984); *Equity Sav. Loan Ass'n v. Chicago Title Ins. Co.,* 190 *N.J.Super.* 340, 342, 463 *A.2d* 398 (App.Div.1983). In certain such instances, our courts have applied what is known as the doctrine of equitable subrogation, which permits the third party lender to inherit, in full or in part, the original lien position of the mortgage that it paid off, even if an intervening lien existed in the meantime. *Investors Sav. Bank v. Keybank Nat'l Ass'n,* 424 *N.J.Super.* 439, 443, 38 *A.3d* 638 (App.Div.2012).

Where equitable subrogation is applied, " 'the new mortgagee by virtue of its subrogated status can enjoy the priority afforded the old mortgagee.' " *Id.* at 443–44, 38 *A.3d* 638 (quoting *Nelkin, supra,* 354 *N.J.Super.* at 565, 808 *A.2d* 856). " 'This result

is reached so that the holders of the intervening encumbrances not be unjustly enriched at the expense of the new mortgagee.' " *Id.* at 444, 38 *A.*3d 638 (quoting *Trus Joist Corp., supra,* 190 *N.J.Super.* at 179, 462 *A.*2d 603); *see generally Third Restatement* § 7.6.[6]

Historically in our state, the doctrine of equitable subrogation has not been made available to a lender that has actual knowledge of an intervening lien, absent an agreement or formal assignment that affords the new lender priority status. *Investors Sav., supra,* 424 *N.J.Super.* at 444, 38 *A.*3d 638; *Nelkin, supra,* 354 *N.J.Super.* at 565–66, 808 *A.*2d 856; *Trus Joist, supra,* 190 *N.J.Super.* at 179, 462 *A.*2d 603. Although our reported cases applying that actual knowledge exception tend to repeat it without discussing its rationale,[7] the exception appears to be grounded upon a premise that a new lender would not be "unjustly" enriching an intervening lienor if it deliberately loaned new funds to the creditor well aware of the existence of that prior lien.

In fact, as of 1997 when the *Third Restatement* was issued, a majority of states adopted this restriction. *See Third Restate-*

---

[6] Section 7.6 of the *Third Restatement* expresses the doctrine as follows:

(a) One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

(b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:

(1) in order to protect his or her interest;

(2) under a legal duty to do so;

(3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or

(4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate.

[7] *See, e.g., Investors Sav., supra,* 424 *N.J.Super.* at 444, 38 *A.*3d 638; *Nelkin, supra,* 354 *N.J.Super.* at 565–66, 808 *A.*2d 856; *Trus Joist, supra,* 190 *N.J.Super.* at 179, 462 *A.*2d 603.

*ment,* § 7.6, cmt. e. However, in some states the approach is even stricter by disallowing equitable subrogation where the new lender has only constructive knowledge of the prior lien.[8] In other states, the approach is more lenient, by treating either actual or constructive knowledge as irrelevant and instead assessing the situation based upon the comparative equities at stake.[9]

▇ To date, our state's case law has limited the exception to actual knowledge. Hence, mere negligence by a new lender in failing to learn about the intervening lien does not preclude the application of equitable subrogation. *Investors Sav., supra,* 424 *N.J.Super.* at 446, 38 *A.*3d 638 (reaffirming the negligence limitation); *Trus Joist Corp., supra,* 190 *N.J.Super.* at 179, 462 *A.*2d 603; *Kaplan v. Walker,* 164 *N.J.Super.* 130, 138, 395 *A.*2d 897 (App.Div.1978); *see also* 29 *N.J. Practice* (Weinstein, Mortgages) (2001) § 13.9. In the same vein, our law has rejected an exception based upon constructive, rather than actual, knowledge. *UPS Capital Bus. Credit v. Abbey,* 408 *N.J.Super.* 524, 530, 975 *A.*2d 548 (Ch.Div.2009) (observing that "constructive notice is not a bar to equitable subrogation").

As we recently highlighted in *Investors Savings, supra,* 424 *N.J.Super.* at 446 n. 3, 38 *A.*3d 638, the *Third Restatement* has repudiated the traditional majority approach and recommends that, subject to certain other factors, "subrogation can be granted even if the payor had actual knowledge of the intervening interest." *Third Restatement,* § 7.6 cmt. e. Instead, the *Third Restatement* drafters suggest that the pivotal question is "whether the payor reasonably expected to get security with a priority equal to the mortgage being paid." *Ibid.* "Ordinarily, lenders who provide refinancing desire and expect precisely that, even if they

---

[8] *See, e.g., Ex parte AmSouth Mortg. Co.,* 679 *So.*2d 251 (Ala.1996).

[9] *See, e.g., Bank of N.Y. v. Nally,* 820 *N.E.*2d 644 (Ind.2005); *American Sterling Bank v. Johnny Mgmt. LV, Inc.,* 245 *P.*3d 535 (Nev.2010); *Bank of America, N.A. v. Prestance Corp.,* 160 *Wash.*2d 560, 160 *P.*3d 17 (2007).

are aware of an intervening lien." *Ibid.; see also id.* at § 7.6 cmt. e, illus. 26.

Under the *Third Restatement's* alternative approach, the pertinent limiting factor is not the new lender's knowledge, but instead whether there has been "material prejudice" to the intervening lienor. *Id.* at § 7.6(b)(4) (authorizing equitable subrogation, so long as it "will not materially prejudice the holders of intervening interests in the real estate").

For example, as the *Third Restatement* drafters explain, "[t]he most obvious illustration [of such material prejudice] is that of a payor who lends the mortgagor more money than is necessary to discharge the preexisting mortgage." *Id.* at § 7.6 cmt. e. If that extra lending occurs, the new lender should be "subrogated only to the extent that the funds disbursed are actually applied toward payment of the prior lien." *Ibid.* "There is no right of subrogation with respect to any excess funds." *Ibid.*

Similarly, the drafters recommend that "if the payor demands a higher interest rate than prevailed under the original mortgage loan, the positions of intervening interest holders may be jeopardized, since the increased interest may result in the mortgage's having a higher balance at the time it is later foreclosed." *Ibid.*[10] In such instances, "[s]ubrogation should be granted only to the extent of the debt balance that would have existed if the interest rate had been unchanged." *Ibid.; see also id.* at § 7.6 cmt. e, illus. 29.

On the other hand, the drafters suggest that "a mere extension of time resulting from the refinancing is generally not regarded as seriously prejudicial to holders of intervening interests[.]" *Id.* at § 7.6 cmt. e. In fact, such an extension of time on the senior loan is "often advantageous" to junior lienors, *ibid.*, because the exten-

---

[10] The drafters recommend that this reasoning should not apply if the original mortgage provided for variable or adjustable interest, and the interest on the refinancing loan falls within the same range allowed under the original loan. *Ibid.*

sion can forestall what otherwise would be a foreclosure on the senior debt that would extinguish the junior lien.

As we also recognized last year in *Investors Savings, supra,* 424 *N.J.Super.* at 446 n. 3, 38 *A.*3d 638, "[a] number of other jurisdictions have adopted [the *Third Restatement's* ] view of the doctrine of equitable subrogation." In one of those out-of-state cases we cited,[11] *Prestance, supra,* 160 *P.*3d at 20–24, the Supreme Court of Washington comprehensively discussed the underpinnings of the "actual knowledge" exception, and offered multiple reasons why that exception should be abandoned.

Among other things, the majority of the Washington justices in *Prestance* pointed out that abandoning the exception in favor of the *Third Restatement's* "material prejudice" approach has several advantages, including (1) discouraging ignorance by a new lender of prior liens; (2) facilitating more refinancing that can help "stem the threat of foreclosure;" and (3) saving homeowners "billions of dollars by reducing title insurance premiums," because a permissive application of equitable subrogation apparently can reduce a title insurer's risks. *Id.* at 24, 28 (citing Grant S. Nelson Dale A. Whitman, *Adopting Restatement Mortgage Subrogation Principles: Saving Billions of Dollars for Refinancing Homeowners,* 2006 *B.Y.U. L.Rev.* 305, 315 (2006)).

We did not need to decide in *Investors Savings, supra,* whether to endorse the *Third Restatement's* recommended approach to equitable subrogation, because the facts in that case, unlike the present one, did not involve a refinancing lender's actual knowledge of an intervening lien. 424 *N.J.Super.* at 445–46, 38 *A.*3d 638. Although the *Third Restatement,* and the newer out-of-state cases that have adopted it,[12] raise significant doctrinal and policy issues, we do not need to resolve them here, either. That is

---

[11] *See also Nally, supra,* 820 *N.E.*2d 644; *Johnny Mgmt., supra,* 245 *P.*3d 535.

[12] *But see Mortg. Elec. Registration Sys., Inc. v. Roberts,* 366 *S.W.*3d 405 (Ky.2012) (declining to adopt the *Third Restatement's* approach under Kentucky law).

because there is an alternative method for analyzing and resolving the priority question before us. Specifically, because the refinanced mortgage loan in 2005 was provided by the same lender—WaMu—as the original 1998 senior mortgage loan, the priority analysis can be guided by principles of "replacement" and "modification."

As Judge Berman correctly recognized in *Abbey, supra,* 408 *N.J.Super.* at 528–29, 975 *A.*2d 548, the modification of a mortgage loan by the same lender does not necessarily have to be treated in the same fashion, with respect to priority over an intervening lienor, as a new loan that has been made by a third party. Factually in *Abbey,* the defendant had initially borrowed $187,450 from Washington Mutual, which the bank then secured with a mortgage against the defendant's property recorded in the first position. *Id.* at 527, 975 *A.*2d 548. A second bank, UPS Capital, held a subordinated mortgage on the property, recorded in the second position. *Ibid.* The defendant later sought to refinance his original loan from Washington Mutual, and the bank lent him $185,000 with terms that carried a lower interest rate and a longer payoff period. *Id.* at 527–28, 975 *A.*2d 548. The defendant ultimately defaulted on these loans. *Ibid.* In the foreclosure proceeding, the two banks, UPS Capital and Washington Mutual, sought to gain a superior lien position over the other. *Id.* at 527, 975 *A.*2d 548.

As Judge Berman correctly observed in that case, Washington Mutual's " 'new' loan was in effect a 'modification' as well as a 'renewal' [because] a lower interest rate was applied and the lien was to be paid over a longer period of time." *Id.* at 528–29, 975 *A.*2d 548. Nevertheless, despite recognizing that Washington Mutual's mortgage was indeed a replacement mortgage, the judge elected to decide the case on the basis of equitable subrogation. *Id.* at 529–33, 975 *A.*2d 548. He noted that the bank did not have actual knowledge that UPS Capital held an intervening lien on the property. *Id.* at 532, 975 *A.*2d 548. Based on this, the judge held

that equitable subrogation applied to permit Washington Mutual to maintain its first priority lien.  *Id.* at 533, 975 *A.*2d 548.

   ■   The same result as in *Abbey,* i.e., priority for the refinancing lender, should obtain here, but specifically under principles of modification and replacement.   In this context, the lender's actual knowledge of an intervening lien is not a bar to its reliance upon equitable principles of priority.   As the *Third Restatement* explains, "subrogation cannot be involved unless the second loan is made by a different lender than the holder of the first mortgage; one cannot be subrogated to one's own previous mortgage."  *Id.* at § 7.6 cmt. e. The *Third Restatement* further instructs in comment e to Section 7.6 that "[w]here a mortgage loan is refinanced by the same lender, a mortgage securing the new loan may be given the priority of the original mortgage under the principles of replacement and modification of mortgages."  *Ibid.* This is in keeping with similar commentary within a leading New Jersey treatise on mortgages, which observes that "equitable subrogation" is doctrinally confined to cases "[w]hen a third party who is not a surety and who has no interest to protect loans [ ] advances money to pay off a mortgage[.]"   29 *N.J. Practice* (Weinstein, Mortgages) (2001) § 13.9.

   In this present distinct context of modification and replacement, we conclude that the critical question of priority must revolve around whether the junior lienor, here Sovereign, has been materially prejudiced.   As Section 7.3 of the *Third Restatement* provides as to replacement:

> (a) If a senior mortgage is released of record and, as part of the same transaction, is *replaced* with a new mortgage, the latter mortgage *retains the same priority* as its predecessor, except
>
> (1) to the extent that any change in the terms of the mortgage or the obligation it secures is *materially prejudicial* to the holder of a junior interest in the real estate, or
>
> (2) to the extent that one who is protected by the recording act acquires an interest in the real estate at a time that the senior mortgage is not of record.
>
> [Emphasis added.]

Similar principles apply if the refinancing causes a modification of the original loan, as set forth in Section 7.3(b) and (c):

(b) If a senior mortgage or the obligation it secures is *modified* by the parties, the mortgage as modified *retains priority* as against junior interests in the real estate, except to the extent that the modification is *materially prejudicial* to the holders of such interests and is not within the scope of a reservation of right to modify as provided in Subsection (c).

(c) If the mortgagor and mortgagee reserve the right in a mortgage to modify the mortgage or the obligation it secures, the mortgage as modified retains priority even if the modification is *materially prejudicial* to the holders of junior interests in the real estate, except as provided in Subsection (d).

[Emphasis added.]

We regard this as a sound approach. A proper judicial analysis of material prejudice will examine such aspects as the respective loan amounts involved, the interest rates, and, potentially the loan terms.[13] Actual or constructive knowledge by the refinancing lender, if it is the same original lender or its corporate successor, should be irrelevant. Consequently, summary judgment entered here in favor of Sovereign, which was predicated on a finding of WaMu's actual knowledge, must be reversed as a matter of law. *See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) (noting an appellate court's de novo review of questions of law). To do otherwise would allow Sovereign to reap an undeserved windfall, particularly since WaMu paid off not only its original mortgage but also paid down in full the balance on the Independence line of credit.

That said, the priority of Deutsche, as WaMu's assignee, must be equitably calibrated to take into account the fact that the $1.19 million in refinancing provided by WaMu in 2005 exceeded the balance then due on WaMu's original $650,000 loan from 1998. A pro tanto "cap" on the new loan's priority appears to be appropriate in this respect, though we do not decide in the abstract on this record whether the cap should be (1) the original $650,000 loan

---

[13] Without resolving the issue conclusively, we tend to agree with the Third Restatement that an extension of the loan term in the refinanced loan is not likely to cause material prejudice to a junior lienor because the refinancing usually is staving off foreclosure on the senior loan.

amount, (2) the $534,000 balance at the time of the Independence loan in 2003, or (3) the roughly $482,000 balance when the refinancing occurred in 2005. Although the refinanced loan was extended at a lower interest rate than the 1998 loan, an analysis of the comparative adjustable rates also may have equitable implications.

We defer these equitable considerations to the trial court on remand, directing that the court evaluate these (and any other identified) matters of potential "material prejudice" to Sovereign, and then to ascertain an appropriate priority amount for Deutsche's lien that comports with these principles.

Reversed and remanded. We do not retain jurisdiction.