164 A.3d 1080

FRANCINE REIBMAN, A MARRIED WOMAN, PLAINTIFF–APPELLANT, v. JAY H. MYERS, A/K/A JAY M. MYERS, A MARRIED MAN, DEFENDANT, AND WELLS FARGO BANK, N.A., TRUSTEE FOR CARRINGTON MORTGAGE LOAN TRUST, SERIES 2006–NC3 ASSET–BACKED PASS–THROUGH CERTIFICATES, A NATIONAL ASSOCIATION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 4, 2017—Decided July 10, 2017

Before Judges Lihotz, Whipple and Mawla.

*Joseph M. Shapiro* argued the cause for appellant (*Middlebrooks Shapiro, P.C.*, attorneys; *Mr. Shapiro* and *Melinda D. Middlebrooks*, of counsel and on the brief).

*Betsy Ann Rosenbloom* argued the cause for respondent (*Williams, Caliri, Miller & Otley, P.C.*, and *Knuckles, Komosinski & Manfro, L.L.P.*, attorneys; *Ms. Rosenbloom*, of counsel and on the brief).

The opinion of the court was delivered by

WHIPPLE, J.A.D.

Plaintiff Francine Reibman appeals from a September 15, 2014 final judgment and an August 15, 2015 default judgment. For the reasons that follow, we affirm.

Plaintiff and defendant Jay Myers were married on May 31, 1980. On January 10, 2001, Myers's father, Maurice Myers (Maurice), purchased a residential property in South Orange for $367,500. Plaintiff contributed approximately $67,000 to the purchase price, and plaintiff, Myers, and their son moved into the property.

Plaintiff and Myers began renovation on the property. Maurice contributed $60,000, and plaintiff's mother and uncle contributed additional funds. On January 4, 2005, Maurice deeded the property to Myers. The property was valued at $870,000 and was unencumbered.

On January 17, 2005, Myers obtained a $225,000 refinance loan from Ameriquest Mortgage Company (Ameriquest). The funds were transferred to Myers's account, which plaintiff could not access. Plaintiff did not sign the Ameriquest mortgage and later claimed she was not aware of it.

On July 20, 2005, Myers deeded the property from himself to himself and plaintiff as husband and wife, and the deed was recorded in the Essex County Register. Myers stated plaintiff had been unhappy the property was solely in his name and requested a

deed to be prepared. Plaintiff, however, maintained she never made such a request and did not know about the transfer.

Plaintiff claims, four months later, on November 17, 2005, Myers forged her signature on a document, which purported to deed the property from plaintiff and Myers back to Myers, as his sole and separate property. Richard Olive, an attorney, prepared the forged deed. That same day, the forged deed was recorded in the Essex County Register.

On November 23, 2005, Myers again mortgaged the property and received $347,000 from Columbia Home Loans, L.L.C. (Columbia). The mortgage was recorded January 4, 2006. The Columbia mortgage satisfied the Ameriquest loan, which was discharged and filed on January 11, 2006, and provided Myers with surplus funds of $74,577.98; the surplus funds were wired to Myers's account that plaintiff could not access.

On January 27, 2006, Olive allegedly prepared another deed, purporting to transfer the property from Myers to Myers and plaintiff, as husband and wife. On June 9, 2006, Myers applied to New Century Mortgage Corporation (NCMC) for a loan and on the application; he acknowledged he was married. The homeowners' insurance policy was in both Myers's and plaintiff's names. On June 16, 2006, Myers obtained a mortgage of $437,500 from NCMC.

Stewart Title Guaranty Company (Stewart) insured NCMC. As part of the NCMC closing documents, Myers certified he was the sole owner of the property; which was not his marital residence. The mortgage instructions provided the "spouse must sign" the closing documents, but plaintiff did not sign any documents.

The NCMC mortgage was recorded July 18, 2006. Proceeds of the loan satisfied the Columbia mortgage, which was discharged on August 3, 2006. In 2007, Carrington Mortgage Services (Carrington) began to service the NCMC mortgage loan by collecting payments and paying taxes and insurance.

On November 20, 2007, Carrington notified Myers his mortgage payment had not been received. In August 2008, Myers sent Carrington a hardship letter explaining he could not pay the mortgage loan because of expenses associated with the illnesses of plaintiff and their son. Myers later claimed plaintiff was aware of the hardship letter and subsequent negotiations with Carrington. In September 2008, Myers and Carrington signed a loan modification agreement; however, as of November 1, 2008, Myers stopped paying the mortgage loan.

At some point in 2009, Myers continued, albeit unsuccessfully, to negotiate with Carrington to re-modify the loan and provided plaintiff's financial information. That same year, plaintiff and Myers separated, and Myers briefly moved out of the property; however, the couple did not divorce. Myers did not financially support plaintiff. She relied upon her disability receipts, stocks, bonds, and investments.

Plaintiff asserts until 2009, she was unaware of the mortgage loan or the forged deed. Correspondence about the loan was mailed to a post office box in Maplewood, which Myers stated plaintiff had access to, but rarely visited.

On January 12, 2010, NCMC assigned the $437,500 mortgage and loan to defendant Wells Fargo. On January 20, 2010, defendant filed a foreclosure complaint, and default was entered against Myers and plaintiff.[1] On February 3, 2010, defendant informed Stewart plaintiff's name did not appear on the underlying loan or mortgage, and defendant sought to reform the documents to reflect her subordinate interest in the property.

On July 13, 2011, Gladys Shrum, on behalf of Carrington, replied to a letter from Myers, questioning the validity of the 2008

---

[1] According to her complaint, after Myers disclosed he had forged plaintiff's signature on the November 2005 deed and borrowed money without plaintiff's knowledge, the Chancery Division vacated default as to plaintiff and transferred plaintiff's third party complaint against Myers to the Law Division and ultimately dismissed the foreclosure action without prejudice.

loan modification agreement because plaintiff had not signed it or the mortgage. Shrum informed Myers the matter had been sent to Stewart for investigation.

On October 11, 2012, plaintiff filed a verified complaint against defendant and Myers seeking declaratory relief, alleging negligence, common law fraud, unjust enrichment, breach of fiduciary duty, and other claims. The court entered default against defendant and Myers; defendant sought to vacate the default, which the court granted, and ultimately filed an answer, cross claims, and counterclaims to establish priority for equitable subrogation, fraud, and negligence against plaintiff and Myers on March 28, 2013. Myers never sought to vacate the entry of default.[2]

On October 11, 2013, plaintiff and defendant cross-moved for summary judgment. Judge Nelson entered partial summary judgment in favor of defendant. The judge granted defendant an equitable mortgage on the property retroactive to April 5, 2005, in the sum of $224,000 with interest for advances of real estate taxes, insurance, and other expenses. The judge dismissed plaintiff's claims against defendant for general damages, punitive damages, and attorney's fees. The judge determined a "factual issue remains on *N.J.S.A.* 3B:28–3.1 and if plaintiff is in joint possession or has extinguished her statutory rights." The judge further ordered plaintiff's interests in the premises "as to priority or subordinate is to be determined" and "[a]ny Final Judgment entered in this matter shall provide that the interest of [p]laintiff ... in the premises, if any, [is] subordinated to the herein equitable mortgage of [d]efendant ...."

In April 2014, Judge Michael V. Cresitello, Jr. conducted a trial on the remaining issues relying, in part, on stipulated facts. The judge reviewed the prior orders entered by Judge Nelson and heard testimony from several witnesses.

---

[2] On August 12, 2015, Judge Michael Nelson entered final default judgment against Myers in favor of plaintiff for negligence, unjust enrichment, common law fraud, breach of fiduciary duty, and torts.

Patricia Guarducci, an employee of Tri State Title Agency, testified she was the closing agent on the NCMC loan. She did not prepare the documents, but she notarized the signatures. The closing documents included instructions to obtain the signature of a non-titled spouse. Guarducci stated for a marital residence, both spouses should sign and be present at the closing.

Mark Borst, vice president at Stewart, stated Stewart insured Tri State, the title insurance company, and Tri State was required to follow Stewart's guidelines. Stewart did not control closing or settlement instructions.

Myers testified the property was mortgage-free when he acquired it in 2005. Myers conceded he forged plaintiff's name on the deed, and Olive, now deceased, had notarized the forged deed. On July 13, 2011, Carrington notified him the NCMC mortgage loan was under investigation because plaintiff did not sign the closing documents.

At his deposition, Myers reported the NCMC mortgage loan proceeds of $400,000 were used to repair the property, including the roof, ceilings, bathrooms, driveway, plumbing, electrical, windows, a patio, and other improvements. At trial, he conceded this statement was untrue. Instead, he claimed the mortgage proceeds were used to pay amounts due to the Internal Revenue Service, for their son's college tuition, a car, and home repairs. He changed his testimony stating the net proceeds from the NCMC and Columbia refinance totaled approximately $65,000–$70,000.

Plaintiff denied knowledge of the 2005 deed, but conceded she had wanted her name on the deed because she had put money into the property. She described renovations to the home and even claimed to have performed some of the work herself.

Chris Lechtanski, assistant vice president of defendant, explained Carrington Mortgage Loan Trust (the trust) was a group of mortgages originated by NCMC and pooled into a securitization; defendant was custodian of the trust. The trust serviced the loans including collecting payments and insurance. Defendant was

the assignee owner and holder of the NCMC mortgage loan. Defendant advanced funds for insurance and taxes to protect its interests. The loan modification agreement was to reduce the interest rate to help the borrower make payments. All household income, including plaintiff's income, would have been considered by defendant in modifying the loan.

Judge Cresitello delivered his oral opinion granting defendant's motion on August 28, 2014. At the outset, Judge Cresitello accepted Judge Nelson's ruling plaintiff's interest was subordinate to defendant's interest. Additionally, the judge determined defendant was the assignee, holder, and owner of the NCMC mortgage loan. The judge also found that by the deed of July 20, 2005, plaintiff acquired a tenancy by the entirety. Defendant's interest was equitably subrogated to the lien of the Ameriquest mortgage loan and to the municipal taxes, utility, and insurance liens, totaling $107,454, as of September 2013. Defendant had an equitable mortgage on the property retroactive to April 5, 2005, in the sum of $224,000, and the interests of plaintiff and Myers were subject to defendant's subrogated interest. Plaintiff benefited from, acquiesced to, and ratified the NCMC mortgage loan. Plaintiff was an equitable mortgagor under NCMC, and her interest in the premises was subject to the NCMC mortgage loan, and the NCMC mortgage loan was equitably reformed to include plaintiff as a mortgagor.

The trial judge found plaintiff lacked credibility because she had demanded to be on the deed; was involved in negotiating the loan modification; claimed she personally renovated some of the home, notwithstanding her disability; and accomplished extensive renovations to the home despite little income for the past fifteen years. The trial judge also noted this was not the first time plaintiff and Myers defaulted on a home mortgage.

The court's key determination was that plaintiff's rights under the New Jersey Joint Possession Statute, *N.J.S.A.* 3B:28–3 to –3.1 (JPS) were released, extinguished, and/or merged by operation of the July 2005 deed.

On appeal, plaintiff argues the trial judge misapplied the JPS, defendant is not entitled to equitable subrogation to the position of the Ameriquest mortgage, the court erred in its determination defendant held an equitable mortgage, and the court erred by finding she ratified or acquiesced to the conduct of defendant and Myers. We address each argument in turn.

Reviewing a trial court's findings in a non-jury trial, we "ponder[ ] whether ... there is substantial evidence in support of the trial judge's findings and conclusions." *Seidman v. Clifton Sav. Bank, S.L.A.*, 205 *N.J.* 150, 169, 14 *A.*3d 36 (2011) (quoting *In re Trust Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson*, 194 *N.J.* 276, 284, 944 *A.*2d 588 (2008)). "Deference [to factual findings] is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.' " *Cesare v. Cesare*, 154 *N.J.* 394, 412, 713 *A.*2d 390 (1998) (quoting *In re Return of Weapons to J.W.D.*, 149 *N.J.* 108, 117, 693 *A.*2d 92 (1997)). However, despite the deference we afford to the trial court's factual and credibility determinations, we review questions of law de novo. *See Toll Bros. v. Twp. of W. Windsor*, 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002).

The trial judge determined plaintiff's interest in the property under the JPS terminated when she came into title pursuant to the July 25, 2005 deed and rejected the argument her rights under the JPS and as a tenant by the entirety could exist simultaneously. Instead, the judge found those rights were mutually exclusive. Thus, when plaintiff obtained title in fee simple in July 2005, she lost her protection under the JPS.

*N.J.S.A.* 3B:28–3 provides,

a. During life every married individual shall be entitled to joint possession with his spouse of any real property which they occupy jointly as their principal matrimonial residence and to which neither dower nor curtesy applies. One who acquires an estate or interest in real property from an individual whose spouse is entitled to joint possession thereof does so subject to such right of possession, unless such right of possession has been released, extinguished or subordinated by such spouse or has been terminated by order or judgment of a court of competent jurisdiction or otherwise.

b. Nothing contained herein shall be construed to prevent the release, subordination or extinguishment of the right of joint possession by either spouse, by premarital agreement, separation agreement or other written instrument.

c. The right of joint possession shall be extinguished by the consent of both parties, by the death of either spouse, by judgment of divorce, separation or annulment, by other order or judgment which extinguishes same, or by voluntary abandonment of the principal matrimonial residence.

*N.J.S.A.* 3B:28–3.1 provides:

The right of joint possession to the principal matrimonial residence as provided in [*N.J.S.A.*] 3B:28–3 is subject to the lien of a mortgage, irrespective of the date when the mortgage is recorded, provided:

a. The mortgage is placed upon the matrimonial residence prior to the time that title to the residence was acquired by the married individual; or

b. The mortgage is placed upon the matrimonial residence prior to the marriage; or

c. The mortgage is a purchase money mortgage; or

d. The parties to the marriage have joined in the mortgage; or

e. The right of joint possession has been subordinated, released or extinguished by subsection b. or c. of [*N.J.S.A.*] 3B:28–3.

The JPS brought New Jersey's probate code current with the Uniform Probate Code, which had abolished dower and curtesy. *Pilone v. Blanda*, 226 *N.J.Super.* 397, 400–01, 544 *A.*2d 439 (Ch. Div. 1988). The abolishment of dower and curtesy eliminated a spouse's protection against the divestiture of real property by the title-holding spouse. *Ibid.* Thus, *N.J.S.A.* 3B:28–3 granted the non-titled spouse a right to possession of the principal matrimonial residence, which could only be abrogated under specific circumstances provided by statute. *Id.* at 401, 544 *A.*2d 439. If the non-titled spouse acquiesced in the sale of the property, the court would enforce the contract. *Ibid.*

Plaintiff argues the court ignored her right under the JPS. According to plaintiff, she acquired joint possession of the property on January 19, 2005, when Maurice deeded the property to Myers and her statutory right to joint possession derived from the fact the property was their principal marital residence. Plaintiff is correct she acquired a right to possession when Maurice deeded the property to Myers in January 2005. At that point, her right to joint possession derived from the fact it was their principal marital

residence and the JPS applied. However, at the point when Myers deeded the property to himself and plaintiff in July 2005, plaintiff became a titled owner, and therefore, no longer enjoyed the protection of the JPS. Acquisition of title to the property cancelled any right to joint possession she previously had.

According to plaintiff, the Legislature intended the JPS to protect a spouse regardless of who holds title to the property, and cites *Arnold v. Anvil Realty Investment, Inc.*, 233 *N.J.Super.* 481, 559 *A.*2d 444 (App. Div. 1989). We do not agree with plaintiff's interpretation of *Arnold* or the JPS. In *Arnold*, the wife held title to the marital residence, and the husband moved from the marital home in anticipation of divorce. *Id.* at 483, 559 *A.*2d 444. After the husband moved out of the marital home, the court ruled he was protected by the JPS because the home was meant to be available for equitable distribution. *Id.* at 483–85, 559 *A.*2d 444. Therefore, *Arnold* stands for the proposition a non-titled spouse has a right to possession of the marital home against the titled spouse's attempt to divest the property. It does not establish the JPS protects a spouse no matter who holds title.

Plaintiff argues her right to joint possession cannot be released, extinguished, or subordinated through merger of her statutory rights into title by virtue of the July 2005 deed. She asserts because statutes trump common law, her JPS rights prevent any common law merger. We disagree.

In *Portuguese v. Ziss*, 2 *N.J.Super.* 397, 400, 63 *A.*2d 919 (Ch. Div. 1949), the Chancery Division explained "merger is presumed as a matter of law from the uniting of the greater and lesser estates in the same person, in the absence of an indication of a contrary intention." Here, the greater estate was the title in fee simple plaintiff obtained via the July 2005 deed. The July 2005 deed merged lesser estate, i.e., any statutory joint possession interest, into the larger estate, not the reverse as plaintiff argues.

In *Anthony L. Petters Diner, Inc. v. Stellakis*, 202 *N.J.Super.* 11, 18–19, 493 *A.*2d 1261 (App. Div. 1985), we clarified merger should not be applied rigidly and mechanically, and the presump-

tion of merger is rebuttable and may be overcome by the equities of the case or by an express declaration of the intention there be no merger. Here, the trial judge rejected plaintiff's argument merger had been rebutted, finding plaintiff wanted to be on the deed because she desired title to the property. The record supports the court's conclusions, as plaintiff was proud of her financial contributions to the property and of the extensive renovations to the marital home. As we explained above, via the July 2005 deed, plaintiff became the titled owner of the property in fee simple. Thus, her lesser estate, i.e., possessory interest under the JPS, merged into the greater estate, namely, her fee ownership. There was no declared or implied intention merger should not occur. Of significance and supporting this conclusion, is the court's rejection of plaintiff's lack of awareness as not credible.

■ Plaintiff also argues her right to joint possession was not subordinate to any mortgage or lien because all mortgages executed by Myers were subject to her right to joint possession, and none of the five statutory exceptions contained in *N.J.S.A.* 3B:28–3.1 were present.

However, we note *N.J.S.A.* 3B:28–3.1(e) provides that "[t]he right of joint possession may be subordinated, released or extinguished by subsections b. or c. of [*N.J.S.A.*] 3B:28–3." *N.J.S.A.* 3B:28–3(b) provides the right of joint possession may be extinguished is pursuant to a "written instrument." The court found the July 2005 deed was a written instrument, which extinguished plaintiff's statutory right to joint possession by giving her title in fee simple to the property. We discern no error in that determination.

We also reject plaintiff's argument regarding equitable subrogation to the position of the Ameriquest mortgage. Judge Cresitello adopted Judge Nelson's determination defendant was equitably subrogated to the lien of the Ameriquest mortgage and to a lien for defendant's advances for insurance and taxes. When plaintiff took title on July 20, 2005, the property was encumbered by the Ameriquest mortgage and she was charged with such knowledge.

Plaintiff therefore took title in fee simple subject to the Ameriquest loan. As a result, the NCMC loan was equitably subrogated to the Ameriquest loan and plaintiff's interest was subordinate to defendant's.

Lenders and other parties are charged with constructive knowledge of properly recorded mortgages. *Sovereign Bank v. Gillis*, 432 *N.J.Super.* 36, 43–44, 74 *A.*3d 1 (App. Div. 2013). Equitable subrogation, a common law concept, seeks "to compel the ultimate discharge of an obligation by the one who ought to pay it." *First Union Nat'l Bank v. Nelkin*, 354 *N.J.Super.* 557, 565, 808 *A.*2d 856 (App. Div. 2002) (quoting *Culver v. Ins. Co. of N. Am.*, 115 *N.J.* 451, 455–56, 559 *A.*2d 400 (1989)). The goal of equitable subrogation is to prevent unjust enrichment. *Gillis*, *supra*, 432 *N.J.Super.* at 45 n.6, 74 *A.*3d 1. Equitable subrogation permits a third party lender "who negligently accepts a mortgage without knowledge of intervening encumbrances [to] subrogate to a first mortgage with priority over the intervening encumbrances to the extent that the proceeds of the new mortgage are used to satisfy the old mortgage." *Inv'rs Sav. Bank v. KeyBank Nat'l Ass'n*, 424 *N.J.Super.* 439, 443, 38 *A.*3d 638 (App. Div. 2012) (quoting *Trus Joist Corp. v. Nat'l Union Fire Ins. Co.*, 190 *N.J.Super.* 168, 179, 462 *A.*2d 603 (App. Div. 1983), *rev'd on other grounds*, 97 *N.J.* 22, 477 *A.*2d 817 (1984)). Thus, the new mortgagee can enjoy the priority status of the old mortgagee. *Ibid.*

To be subrogated to the rights of an old mortgagee, the new lender must lack knowledge of the other encumbrance. *Nelkin*, *supra*, 354 *N.J.Super.* at 565–66, 808 *A.*2d 856. This is because "a new lender would not be 'unjustly' enriching an intervening lienor if it deliberately loaned new funds to the creditor" while it was aware of the prior lien. *Gillis*, *supra*, 432 *N.J.Super.* at 45, 74 *A.*3d 1.

Plaintiff argues the court erred when determining equitable subrogation applied because NCMC did not pay off the Ameriquest mortgage, which was discharged on December 3, 2005, more than eighteen months prior to the June 2006 NCMC closing, and

48

defendant is not entitled to be subrogated to the Ameriquest mortgage.[3] It is true NCMC did not pay off the Ameriquest loan, however, equitable subrogation is appropriate "to the extent that the proceeds of the new mortgage are used to satisfy the old mortgage." *KeyBank, supra,* 424 *N.J.Super.* at 443, 38 *A.*3d 638 (quoting *Trus Joist Corp., supra,* 190 *N.J.Super.* at 179, 462 *A.*2d 603). Because NCMC paid off the Columbia mortgage, which, in turn, paid off the Ameriquest loan, equitable subrogation was appropriately applied. In fact, plaintiff and Myers benefited from the payoff of the Ameriquest loan by Columbia and ultimately by NCMC.

 Moreover, plaintiff is not materially prejudiced by the subrogation because she would have been obligated to pay the Ameriquest loan. Notwithstanding plaintiff's assertion equitable subrogation is only permitted where the lender paid off the priority loan, equitable subrogation is permitted "to the extent that the proceeds of the new mortgage are used to satisfy the old mortgage," *ibid.,* or to pay off "senior liens." *UPS Capital Bus. Credit v. Abbey,* 408 *N.J.Super.* 524, 530, 975 *A.*2d 548 (Ch. Div. 2009). Here, the proceeds of the NCMC loan were used to pay senior liens including the Columbia mortgage, which had paid off Ameriquest. The court is empowered to fashion a remedy to prevent unjust enrichment. We discern no abuse in the exercise of such discretion.

Plaintiff argues that Judge Nelson erred in his determination defendant held an equitable mortgage. We disagree.

 An equitable mortgage is created by agreement of the parties. *James Talcott, Inc. v. Roto Am. Corp.,* 123 *N.J.Super.* 183, 203, 302 *A.*2d 147 (Ch. Div. 1973). "If a deed or contract . . . is used for the purpose of pledging real property, . . . as security for a debt or obligation, and with the intention that it shall have effect

---

[3] We recognize the date of the discharge of the Ameriquest mortgage to be January 11, 2006, as the filed date on the document provided in the record.

as a mortgage, equity will give effect to the intention of the parties. Such is an equitable mortgage." *J.W. Pierson Co. v. Freeman,* 113 *N.J.Eq.* 268, 270–71, 166 *A.* 121 (E. & A. 1933).

Express words are not necessary to create an equitable mortgage; however, it must be clearly apparent from the instrument or surrounding circumstances, that the maker of the instrument intended the property to be security for the obligation. *James Talcott, Inc., supra,* 123 *N.J.Super.* at 203, 302 *A.*2d 147. The character of the instrument is determined by the intention of the parties at the time of its execution. *Id.* at 202, 302 *A.*2d 147.

In *Zaman v. Felton,* 219 *N.J.* 199, 217–19, 98 *A.*3d 503 (2014), the New Jersey Supreme Court adopted the standard set forth in *O'Brien v. Cleveland,* 423 *B.R.* 477 (Bankr. D.N.J. 2010), for determining the existence of an equitable mortgage. When a guarantor takes property as security for his or her guaranty, an equitable mortgage is created. *Zaman, supra,* 219 *N.J.* at 216–17, 98 *A.*3d 503.

*O'Brien* identified eight factors to assist courts in determining whether the parties created an equitable mortgage. *See Zaman, supra,* 219 *N.J.* at 218, 98 *A.*3d 503 (quoting the *O'Brien* factors). Those eight factors are: statements that the homeowner should continue ownership of the property; disparity between the value received by the homeowner and the value of the property; an option to repurchase; the homeowner's continued possession of the property; the homeowner's continued duty to pay real estate taxes; a disparity in bargaining power; an irregular purchase process; and financial distress of the homeowner. *Ibid.*

Plaintiff argues an equitable mortgage only exists where both parties intend the loan was advanced as a security interest in real property. Plaintiff claims she never intended the property be used as security for a loan. Plaintiff argues the court did not find the *O'Brien* factors; however, plaintiff acquired title to the property subject to the existence of the Ameriquest loan. Even if she did not intend to subsequently mortgage the property, she enjoyed

the benefits of the loan. In fact, surrounding circumstances indicated plaintiff knew of the existence of the mortgage and enjoyed its benefits even if she did not sign closing documents. Therefore, the record supports a finding plaintiff intended the property to be a guarantee for the loan's repayment.

Here, the court determined plaintiff was an equitable mortgagor because she reaped the benefits of the mortgage by renovating the property, living in the marital home without paying tax or homeowner's insurance, and never questioned where Myers obtained the significant funds to renovate the home, though neither she nor Myers had substantial earnings. The circumstances surrounding the loan indicated, even though plaintiff did not sign the documents, she consented to using the property as a guarantee for the loans. The *O'Brien* factors are meant as guidance for a court and need not all be present for the court to find an equitable mortgage. *Ibid.* We do not consider such an omission fatal to the court's analysis.

Lastly, we reject plaintiff's assertion the court erred by finding she ratified or acquiesced to the conduct of defendant and Myers.

The intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it. *Citizens First Nat'l Bank v. Bluh*, 281 *N.J.Super.* 86, 98, 656 *A.2d* 853 (App. Div. 1995). However, in most cases, the silence or inaction of a principal will not ratify the agent's unauthorized act unless it is clear that the principal was fully informed of what the agent did. *Ibid.*

Here, the judge characterized plaintiff as engaging in "willful blindness" as she had stopped working in 2000 and Myers's business produced almost no income. Tax returns for plaintiff and Myers showed minimal earnings. Yet plaintiff and Myers renovated extensively and proudly discussed the many improvements to their home. The court determined it would have been impossible for plaintiff to participate in renovating the house to such an extent without knowing there was a source of funds coming into the household, which had not been earned by her or Myers. In

fact, the court noted plaintiff was highly educated, had been involved in a previous foreclosure action, participated in extensive renovations, and described in detail the many renovations to the home, including the new roof, new bathrooms, floors, basement, attic, windows, and patio. We discern no reason not to defer to the judge's assessment.

In sum, we hold the JPS does not override valid liens by third parties against a marital residence without regard to title. The July 2005 deed, a written instrument pursuant to *N.J.S.A.* 3B:28–3.1(e), gave plaintiff title in fee simple and subordinated her rights under the JPS. Defendant is entitled to equitable subrogation to the position of the Ameriquest mortgage based upon the court's equitable ability to prevent unjust enrichment and the evidence in the record supports the finding plaintiff knew of the existence of the mortgage and enjoyed its benefits despite not signing.

Affirmed.