**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5689-16T1

U.S. BANK NATIONAL
ASSOCIATION, AS TRUSTEE
FOR RESIDENTIAL FUNDING
MORTGAGE SECURITIES, I INC.,
MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2007-S1,

     Plaintiff-Respondent,

v.

ADELE M. GALLAGHER,
MR. GALLAGHER, UNKNOWN
SPOUSE OF ADELE M. GALLAGHER,
 MRS. GALLAGHER, UNKNOWN
SPOUSE OF JOHN P.GALLAGHER,
MORTGAGE ELECTRONIC
 REGISTRATION SYSTEMS, INC., as
nominee for GMAC MORTGAGE, LLC,
and STATE OF NEW JERSEY,

     Defendants,

and

JOHN P. GALLAGHER,

     Defendant-Appellant.

_____

Argued March 18, 2019 – Decided July 22, 2019

Before Judges Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Gloucester County, Docket No. F-017050-15.

AllynMarie Smedley argued the cause for appellant (Smedley & Lis, LLC, attorneys; AllynMarie Smedley, on the briefs).

Barry J. Muller argued the cause for respondent (Fox Rothschild, LLP, attorneys; Barry J. Muller, on the brief).

PER CURIAM

John and Adele Gallagher were married for thirty years. John[1] worked in senior management positions since 1990. His job involved extensive travel, requiring him to be away from home from Monday to Friday each week. As a result, Adele handled the family's finances. In 1996, the couple purchased property in Clarksboro (the property) and built a home where they resided together until 2014. After the home was built, they converted a construction loan to a mortgage loan, secured by the property. Over the ensuing years, they refinanced the mortgage, obtaining four separate mortgage loans encumbering

---

[1] To avoid confusion, we use their first names throughout the balance of the opinion. We intend no disrespect by this informality.

the property. In 2013, Adele stopped making payments on the then outstanding mortgage to plaintiff, U.S. Bank National Association as Trustee for Residential Funding Mortgage Securities, I Inc. (RFMSI), Mortgage Pass-Through Certificates, Series 2007-S1 (U.S. Bank). As a result, in 2015, U.S. Bank filed a foreclosure complaint against the Gallaghers.

In 2014, John allegedly discovered for the first time that Adele had obtained the refinance mortgages without his knowledge or consent. He claimed she hid their existence from him by forging his signature and creating two fake power of attorney documents bearing his forged signature. Following this discovery, John filed for divorce. A final judgment of divorce (JOD) was entered on June 17, 2016, incorporating a marital settlement agreement (MSA) in which John was granted Adele's interest in the property, pending the outcome of the foreclosure action. John filed a contesting answer to the foreclosure complaint, including affirmative defenses, counter-claims, and cross-claims, essentially alleging that the mortgage was obtained through fraud and therefore unenforceable. On March 23, 2017, the trial court granted U.S. Bank's motion for summary judgment and struck John's pleadings. On July 17, 2017, final judgment of foreclosure was entered in U.S. Bank's favor.

A-5689-16T1

John now appeals from the July 17, 2017 final judgment, raising the following points for our consideration:

> POINT I[:] THE TRIAL COURT ERRED IN FINDING THERE WAS NO GENUINE ISSUE OF MATERIAL FACT IN ENTERING SUMMARY JUDGMENT AGAINST . . . JOHN . . . , THIS ERROR WARRANTS THE REVERSAL OF SUMMARY JUDGMENT AND THE FINAL JUDGMENT OF FORECLOSURE BEING VACATED.[2]
>
>> A. THE TRIAL COURT'S FAILURE TO CONSIDER THE ALLEGATIONS RAISED IN THE PARTIES' DIVORCE IN FINDING THERE WAS NO GENUINE ISSUE OF MATERIAL FACT AS TO THE VALIDITY OF THE POWER OF ATTORNEY, THE MORTGAGE AND LOAN DOCUMENTS[,] OR [U.S.] BANK'S MORTGAGE AS TO . . . JOHN . . . WAS REVERSIBLE ERROR AND AN ABUSE OF DISCRETION (NOT ARGUED BELOW).
>>
>> B. WHETHER OR NOT . . . JOHN . . . RATIFIED [U.S.] BANK'S MORTGAGE IS AN ISSUE OF GENUINE MATERIAL

---

[2] John's notice of appeal does not include the March 23, 2017 summary judgment order. Ordinarily, "it is only the judgments or orders . . . designated in the notice of appeal which are subject to the appeal process and review." Pressler & Verniero, Current N.J. Court Rules, cmt. 6.1 on R. 2:5-1 (2019). Nonetheless, because the July 17, 2017 final judgment was premised on the summary judgment order, "we will address the propriety of the earlier order, particularly since [plaintiff] has not argued against our ruling on its validity." W.H. Indus., Inc. v. Fundicao Balancins, Ltda, 397 N.J. Super. 455, 459 (App. Div. 2008).

4

FACT; THE TRIAL COURT'S FAILURE TO FIND THIS FACT IN FAVOR OF [JOHN] WAS AN ABUSE OF DISCRETION.

POINT II[:] THE TRIAL COURT'S DETERMINATION THAT THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF [U.S.] BANK WAS AUTHORIZED BY MARIONI V. ROXY GARMENTS DELIVERY [COMPANY, INCORPORATED], 417 N.J. SUPER. 269 (APP. DIV. 2010)[,] WAS NOT SUPPORTED BY THE FINDINGS OF FACT AND CONCLUSIONS OF LAW MADE ON THE RECORD AND THEREFORE WAS AN ABUSE OF DISCRETION (NOT ARGUED BELOW).

POINT III[:] THE TRIAL COURT'S FINDING OF AN EQUITABLE MORTGAGE IN FAVOR OF PLAINTIFF WAS PLAIN ERROR AND AN ABUSE OF DISCRETION (NOT ARGUED BELOW).

A. THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO MAKE FINDINGS OF FACT AS TO THE EIGHT FACTORS TO BE CONSIDERED IN FINDING AN EQUITABLE MORTGAGE AS SET FORTH IN ZAMAN V. FELTON, 219 N.J. 199 (2014) (NOT ARGUED BELOW).

B. THE TRIAL COURT ERRED IN GRANTING AN EQUITABLE MORTGAGE AS THE EVIDENCE PRESENTED AT SUMMARY JUDGMENT WAS NOT SUFFICIENT TO SUPPORT SUCH A FINDING.

C. THE TRIAL COURT'S DECISION TO AWARD AN EQUITABLE MORTGAGE AND GRANT [U.S.] BANK'S MOTION FOR SUMMARY JUDGMENT WAS REVERSIBLE ERROR AND AN ABUSE OF DISCRETION DUE TO THE COURT ASSUMING FACTS NOT IN EVIDENCE BY CONCLUDING THAT THE PROCEEDS OF THE MORTGAGE AT ISSUE WERE USED FOR THE GALLAGHER FAMILY EXPENSES (NOT ARGUED BELOW).

D. THE TRIAL COURT'S FINDINGS REGARDING THE BLUE RIBBON PANEL RECOMMENDATION AND THE RESULTANT [MSA] ARE NOT SUPPORTED BY THE RECORD [AND] WERE AN ABUSE OF DISCRETION IN AWARDING [U.S.] BANK AN EQUITABLE MORTGAGE AGAINST . . . JOHN . . . .

E. THE TRIAL COURT'S FINDING THAT THERE WAS ONLY ONE MORTGAGE FORGED BY ADELE . . . DURING HER MARRIAGE TO JOHN . . . IS NOT SUPPORTED BY THE RECORD; THE [TRIAL] COURT'S RELIANCE ON THE USE OF THE MORTGAGE PROCEEDS IN ITS FINDING OF AN EQUITABLE MORTGAGE WAS PLAIN ERROR (NOT ARGUED BELOW).

For the reasons that follow, we reverse.

A-5689-16T1

We confine our review to the motion record before the Chancery Division judge, see Ji v. Palmer, 333 N.J. Super. 451, 463-64 (App. Div. 2000), viewed in the light most favorable to the non-moving party. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995)).

The Gallaghers were married on October 18, 1986. Three children were born of the marriage. Since 1990, John worked in senior management positions for Computer Sciences Corporation (CSC), a government contractor, where he earned an annual salary of approximately $400,000. His positions required him to be away from home during the week, leaving on Monday mornings and returning on Friday nights each week. As a result, Adele was responsible for running the household and controlled the family's finances, which included paying all bills. Due to this arrangement, John did not "check[] his financial status for [twenty] years."

On July 2, 1998, the Gallaghers executed a twenty-year note in the principal amount of $195,000. To secure the note, they obtained a mortgage (the first mortgage) encumbering the property, where they built the marital residence and resided together until 2014. On September 25, 1998, the Gallaghers executed a second note in the amount of $52,000. To secure the note,

A-5689-16T1

they obtained another mortgage (the second mortgage) encumbering the property. On February 8, 2003, the Gallaghers executed a third note in the amount of $211,000. To secure the note, they obtained another mortgage (the third mortgage) encumbering the property. The third mortgage satisfied both the first and second mortgages.

On February 2, 2004, John purportedly executed a power of attorney granting Adele authority "to act as [his] [a]gent" to "execute any and all documents, including . . . [m]ortgage or loan documents . . . in connection with the refinance of [the property], including the right to accept any proceeds, . . . deposit[,] or withdraw any proceeds." Michael Magee, Esq., signed the power of attorney as a witness, certifying that John "personally came before [him] and acknowledged under oath," that John "personally signed [the] document[.]"[3] With the power of attorney, on February 17, 2004, Adele executed a twenty-year note and mortgage (the fourth mortgage) in the amount of $391,894.48 on behalf of John and herself. In addition to satisfying the third mortgage, the fourth mortgage was used to satisfy $162,271.80 in credit card debt and yielded $15,868.48 in cash proceeds.

---

[3] Magee also notarized the third mortgage, which John later disputed signing.

A-5689-16T1

On November 21, 2006, John purportedly executed another power of attorney, granting Adele authority "to act as [his] [a]gent" to "execute any and all documents, including . . . [m]ortgage or loan documents . . . in connection with the sale of [the property], . . . including the right to accept any proceeds, . . . deposit[,] or withdraw any proceeds in connection with . . . [the] sale." The power of attorney was again witnessed by Magee, who certified that John "personally came before [him] and acknowledged under oath," that he "personally signed [the] document[.]" With the power of attorney, on November 22, 2006, Adele executed a note and mortgage (the fifth mortgage) in the amount of $456,000, on behalf of John and herself, to Mortgage Electronic Registration Systems, Inc. as nominee for GMAC Mortgage, LLC (GMAC). The fifth mortgage satisfied the fourth mortgage, $70,474 in credit card debt, and yielded $5066.26 in cash. Additionally, on that same date, the Gallaghers obtained a $57,000 home equity line of credit (HELOC) from GMAC, which was used to satisfy $29,504 in credit card debt as well as provide cash proceeds in the amount of $27,386. The fifth mortgage (the subject mortgage) was recorded on December 6, 2006.

A-5689-16T1

On November 12, 2012, the subject mortgage was assigned to plaintiff, which assignment was recorded on November 15, 2012.[4] On July 1, 2013, Adele stopped making payments on the subject mortgage and the HELOC. Plaintiff sent the Gallaghers a Notice of Intention to Foreclose (NOI) at the property address on February 22, 2014. When they failed to cure the default, plaintiff filed a foreclosure complaint against the Gallaghers on May 8, 2015. The foreclosure litigation led to the unraveling of the alleged fraudulent scheme Adele had perpetrated against John over the course of the marriage.

In his deposition, John testified he first became aware of the alleged scheme in April 2014, when his brother notified him that he had several mortgages and powers of attorney bearing his signature. John's brother had been looking into purchasing real estate with John and discovered the records using a land records database. Within a week of the discovery, John filed a revocation of the powers of attorney with the Gloucester County Clerk's Office. He also contacted his bank and discovered that the couple's investment account, where he believed he had accrued over $1.6 million in savings from earnings, bonuses,

---

[4] Howard Handville, a duly authorized senior loan analyst acting on plaintiff's behalf, later certified that "[p]laintiff ha[d] been in possession of the original [n]ote since on or before January 12, 2007."

and expense reimbursements, was empty. After confronting Adele, John packed a bag, left the marital residence, and filed for divorce on October 9, 2014.

Beginning with the second mortgage and all subsequent mortgages as well as the HELOC, John claimed he was unaware of the mortgage loans, did not apply for them, did not sign any mortgage loan documents, and believed Adele forged his signature. John also denied signing the powers of attorney, denied authorizing Adele to sign mortgage loan documents on his behalf, and denied knowing Michael Magee. Further, John denied obtaining any proceeds from the loans or even being aware of their existence. According to John, Adele concocted an elaborate scheme to hide the existence of the loans by presenting him with fake tax returns, fake mortgage interest statements, and fake mortgage statements. She also solicited individuals to pose as mortgage or bank representatives to address any discrepancy in the records. Subsequently, she would destroy the fake statements and file accurate returns with the Internal Revenue Service (IRS). In addition, when the couple first purchased the property, they had set up a post office box while their home was under construction. After the home was built, Adele insisted on keeping the post office box. In so doing, she was able to conceal the mortgage statements, bank

statements, and credit card statements for cards he was unaware of, resulting in him only seeing what she "wanted [him] to see."

During his deposition, John was confronted with an August 7, 2009 Equifax report addressed to him at the property address. The report responded to a request to reinvestigate a GMAC mortgage appearing on John's credit report. John testified that he had no recollection of submitting the request and added that there was no credit report run for him for work around that time. Further, in 2011, when Adele's sister told John he had a $4000 mortgage payment during an argument with her sister, John "laughed" and informed her he did not have a $4000 mortgage payment. Instead, consistent with their first mortgage, John believed their mortgage payment was about one-half of that amount.

During Adele's deposition, she invoked her Fifth Amendment right against self-incrimination whenever she was questioned about fabricating documents or forging John's signature on mortgage or power of attorney documents. However, she admitted she never informed John about any of the refinance mortgages on the property. She testified that she believed John had authorized her to act on his behalf based on him expressly authorizing her to take care of the family's finances. As a result, she posited that if she had signed John's name

on any of the mortgage or power of attorney documents, she was authorized by John to do so.

Adele explained that John "hoarded" money and refused to provide her with enough money to handle the household expenses. She claimed John was physically and verbally abusive to her whenever they discussed finances. To avoid the abuse, she relied on credit cards to compensate for the financial shortfall and used the money generated by the mortgage refinance loans to pay off the credit card debt and for other family-related expenses, including college expenses for the children and the upkeep of the marital residence. She denied putting the money in any type of secret slush fund and denied having any type of addiction problem. According to Adele, she concealed her actions from John out of fear for her safety if he discovered the true state of their finances.

Both John and Adele filed contesting answers to the foreclosure complaint on July 8 and June 23, 2015, respectively. John's pleadings included twenty-six affirmative defenses, counter-claims against plaintiff, and cross-claims against

Adele[5] and Magee,[6] alleging, among other things, that the subject mortgage was obtained through fraud. On March 4, 2016, the court granted plaintiff summary judgment against Adele.

On June 17, 2016, a final divorce judgment was entered. In an effort to settle the matter without trial, the parties had agreed to forego submitting their dispute to a matrimonial early settlement panel (MESP) and instead submitted the matter to a blue ribbon panel of family law experts. After the parties provided written submissions, a recommendation was issued by the panel which provided the basis for the MSA that was later incorporated into the JOD. In the MSA, John was granted exclusive possession of the property, pending the outcome of the foreclosure action, and Adele was required to vacate the residence.

On July 22, 2016, on plaintiff's motion, the court ordered Adele to submit to the court "for in camera inspection" "all documents submitted to the [b]lue [r]ibbon [p]anel." Following the review, the court allowed plaintiff to view

---

[5]  John's October 9, 2014 divorce complaint against Adele alleged fraud, fraudulent inducement, dissipation of assets, and unjust enrichment.

[6]  On October 6, 2015, John also filed a five-count complaint against Magee alleging legal malpractice, negligence, negligent misrepresentation, civil conspiracy, and fraud.

designated documents, reasoning that the documents were relevant to "John's knowledge and ratification of the mortgage; Adele's actual or implied authorization to enter into the mortgage transaction on behalf of John; the use of and access to mortgage proceeds by John; and the use of mortgage proceeds to satisfy legitimate joint marital debts." The court further directed that "[p]laintiff may not use the arguments made by counsel in their submissions to the [b]lue [r]ibbon [p]anel as evidence or argument in this case; however, plaintiff may make any appropriate arguments supported by evidence whether or not made in the divorce action."

One of the documents generated in the divorce action was a report by Michael Saccomanno, a forensic accountant hired by John to trace Adele's use of the money. Saccomanno found that from "July 1, 2006[,] through April 18, 2014[,]" Adele "had access to" approximately $300,395 annually, and based on her Case Information Statement (CIS), reported "lifestyle expenses" of $19,452 monthly, or $233,424 annually. Thus, according to Saccomanno, assuming Adele's current CIS expenses were similar to prior years, Adele "had access to and utilized significantly more funds than what was reasonably required for the family lifestyle expenses." Saccomanno calculated that Adele had approximately "$66,971 annually" in excess funds that were misappropriated.

Additionally, Saccomanno determined that in addition to the annual $66,971 in excess funds, Adele "incurred debt totaling $679,041" without John's "signature or consent."

On January 19, 2017, plaintiff moved for summary judgment against John. During oral argument conducted on March 23, 2017, plaintiff argued that an equitable mortgage existed because John had "every opportunity to prevent this by simply monitoring what his wife was doing for the past [twenty] years[.]" Plaintiff further argued that John "already received reimbursement for [the] mortgage" through the divorce judgment that gave John "a credit" for what Adele would "otherwise . . . have been entitled to in equitable distribution." Plaintiff also asserted there was no doubt that John "expressly authorized his wife to maintain all of the family's finances[,]" and he was "bound" by that grant of authority in relation to "third parties," even if Adele "exceeded" its scope.

Additionally, according to plaintiff, John ratified the mortgage because he had "at least inquiry notice of the mortgage" from the Equifax reinvestigation report in 2009, and his sister-in-law's comment about his mortgage payment in 2011. Further, he had actual notice in April 2014, but took no action to "disavow" the mortgage until a year later when he filed his pleadings in the foreclosure action. Plaintiff continued that at the very least, it was "entitled to

A-5689-16T1

an equitable lien" for the portion of the mortgage that "was used to pay off the original mortgage" on the property. Moreover, according to plaintiff, in the absence of any evidence that the "other debts" extinguished by the proceeds of the mortgage "were used for anything other than family expenses[,]" "it would be unjust enrichment for [John] to get th[e] house free of the mortgage with all of those debts and obligations paid" as well as "money . . . from his wife in the divorce action."

John opposed the summary judgment motion, asserting "there [were] triable issues of fact in th[e] case[.]" He urged the court to strike Adele's deposition testimony as "completely self-serving," and not to rely on the blue ribbon panel's recommendations, but to look instead to the actual terms of the MSA. Further, he disputed granting Adele authority to "encumber" the property and asserted that "the effect of a forgery is that the forged document is null and void." Thus, according to John, there was no "valid lien on the property" and "the mortgage itself [was] void."

Following oral argument, the court granted plaintiff's motion. In an oral decision, initially, the court recited the standard for summary judgment and the requirements for a judgment of foreclosure. Relying on Judson v. Peoples Bank & Trust Company of Westfield, 17 N.J. 67 (1954), and Brill, 142 N.J. at 529,

17 <span>A-5689-16T1</span>

the court noted that while "the non-moving party[] [was] entitled to have all facts and inferences viewed" in its favor, "[t]he deference granted to the non-movant [did] not . . . mean that it [could] defeat a [m]otion for [s]ummary [j]udgment merely by pointing to a disputed fact of an insubstantial nature." Further, citing <u>Central Penn National Bank v. Stonebridge Limited</u>, 185 N.J. Super. 289, 302 (Ch. Div. 1982), the court explained that "to obtain a judgment in a foreclosure action, the mortgagee must establish . . . that the mortgage and loan documents are valid, . . . that the mortgage loan [was] in default, and . . . that the mortgagee has a contractual right to foreclose on the property."

Turning to the facts, the court recited the undisputed facts as follows:

> Adele . . . and John . . . were married on October 18, 1986.  The Gallaghers have three children . . . .
>
> From July 1998 until April 2014, the Gallaghers resided . . . in Clarksboro.  That is the marital property.  In July 1998, the Gallaghers had a [twenty]-year mortgage on the property in the principal amount of $19[5],000 with a monthly payment of approximately $[2400].
>
> . . . [John] has been employed by [CSC] since 1990.  [CSC] is a Fortune 500 American multi-national corporation that provides information technology services and professional services.  It[] [is] headquartered in Falls Church, Virginia.  It has 56,000 employees in over [sixty] countries.  Its clients include [c]ommercial [e]nterprises, the U.S. Federal

Government, as well as [s]tate, [l]ocal[,] and non-U.S. [g]overnment [a]gencies.

During various time periods[,] [John] has held senior management positions with CSC in its North American Public Sector. The North American Public Sector is one of the nation's largest information technology and outsourcing solution providers to the [f]ederal [g]overnment.

. . . .

[John] has been described as an intelligent man with an important position at CSC which is pretty high up the chain. In connection with this and throughout his employment[,] [John] obtained necessary security clearances to work on government projects. All such security clearances require a credit check.

[John] earns approximately $400,000 per year. [John's] typical work schedule required him to depart from his home in Clarksboro on Monday morning and not return until Friday evening. Thus, for approximately [twenty] years[,] Adele paid all of the family bills and maintained and controlled all of the family finances.

. . . .

The Gallaghers ceased making monthly payments on the mortgage in July 2013. On October 9, 2014[,] after [twenty-eight] years of marriage, [John] filed for divorce against Adele and alleged the financial fraud.

On May 8, 2015, U.S. Bank filed this action to foreclose the mortgage. [John] did not notify the [b]ank of Adele's alleged fraud and took no formal action to

repudiate the mortgage until July 8, 2015[,] when he filed his counter[-]claim in the foreclosure action. Adele does not dispute the validity of the mortgage and [s]ummary [j]udgment has been entered against her.

The Gallaghers settled their [divorce] action by [j]udgment entered June 17, 2016. . . . As part of the [j]udgment, the Gallaghers agreed to repay all the credit card debt and loans incurred by Adele except for the mortgage. As of this date, the Gallaghers remain joint owners of the mortgage. Adele no longer resides at the property. [John] resides at the property.

Addressing the disputed facts, the court stated:

[John] disputes [when] he became aware of . . . the disparity in the mortgage. He believes that he owed about [$]56,000. He believed that the mortgage was [$2400] a month. At some point there was an argument between Adele and her sister where the sister said that it was [$4000] a month.

In any event, there is a credit report from Equifax directed to John P. Gallagher at the property address and dated August 7, 2009[,] which indicates that it[] [is] a reinvestigation at the request of [John].

Now, I do[] [not] know what inference to draw from that. It does[] [not] make sense to me that [Adele] would be checking on her credit. But I can[not] be sure that if it came to the property address that [John] would have ever seen it. So I[] [a]m not going to rely on that as a fact.

I[] [a]m not going to consider Adele Gallagher's testimony, not just because she[] [has] exercised her Fifth Amendment right to not answer certain questions, but more because [of] . . . her lack of transparency . . .

or actual fraud, which brings us all here today. So it would not be appropriate to consider her statements truthful in deciding a [m]otion for [s]ummary [j]udgment.

The court acknowledged that "[t]his [was] a most unusual case." The court explained:

> I do[] [not] think I [ha]ve seen a mortgage signed by a [p]ower of [a]ttorney in all my time doing foreclosures. Nor have I seen a situation where, as in this case, a . . . husband is making substantial money, $400,000 a year, but his work duties are such that he leaves home Monday through Friday. So he[] [i]s only home on weekends. And it[] [i]s this schedule that he alleges allowed his wife the opportunity to drain down all the assets and acquire so much debt.
>
> Wife, on the other hand, contends that she had to do what she had to do in order to keep the parties' lifestyle.

The court continued:

> The very essence of this action is . . . the dysfunctionality of this marriage. The fact that somebody for [twenty] years could [travel for] . . . work Monday through Friday. And I do[] [not] know what he does on the nights when he[] [is] out, but that he did[] [not] think to occasionally check his bank account, that he did[] [not] think to occasionally look at his [m]ortgage [s]tatement is unusual. But again, the whole facts of this case are unusual.

Finding that "both parties signed the original mortgage," which was satisfied with the proceeds of a mortgage obtained by Adele "using the improper

21

[p]ower of [a]ttorney,"[7] the court concluded that "both the mortgage company and the husband were the victims of [Adele's] . . . lack of transparency[.]" However, the court had "difficult[y] . . . understand[ing]" "how you stay married for [twenty-eight] years and kind of . . . have a bag over your head."  Further, the court pointed out that in addition to satisfying the original mortgage, the proceeds of the subject mortgage "paid off credit card debts and some [$5000]–plus went into the parties' joint checking account."  Additionally, according to the court, "compar[ing] the language of the [JOD] . . . with the language of the [b]lue [r]ibbon [p]anel," it "appear[ed] . . . that after a [twenty-eight]-year marriage[,] the wife essentially received nothing in equitable distribution and owed her husband approximately $97,500, which was then used to offset her interest in his pension."[8]

---

[7]  This determination by the court ignores the chain of mortgage refinance loans executed over the years.

[8]  In that regard, the court recounted at length the provisions of the MSA as well as the recommendations of the blue ribbon panel, which noted that "[o]n a [twenty-eight-year] marriage with three children[, Adele] may have an alimony case."  However, under the MSA, Adele "waive[d] alimony."  Further, based on John's allegation that the subject mortgage was "obtained without his knowledge or consent[,]" as well as his "post-[c]omplaint efforts" in contesting the foreclosure, the MSA provided that if he was "successful" in "sav[ing] the property from foreclosure, it shall remain his sole property and [Adele] shall receive nothing by way of equity payment or credit for [John's] retention of this asset."

A-5689-16T1

Thus, the court determined:

> While objectively it[] [is] almost impossible to believe that this man would not have checked his financial status for [twenty] years. It[] [is] what happened. And the day that he found out that instead of having a house that[] [is] almost paid off, he[] [has] . . . a house he owes $400,000 on. And instead of having . . . resources for retirement, he[] [has] . . . next to nothing.
>
> And that[] [is] what happen[ed] here. But by the same token, it[] [is] his wife that did this. It[] [is] not the mortgage company that did this. And at some level one would think he had a better sense of the value of money. . . .
>
> So the best . . . way that I think of this is that these are basically two parties that are affected by the wife's conduct. . . . [H]owever, [John was] unable to demonstrate gambling, drugs, alcohol, [or] anything but lifestyle that this money was spent on. Lots and lots of credit cards. Lots of cars. Lots of college. And now based on the marital agreement, it seems to be that while [John will] never be made whole in the sense that . . . his whole psyche in life has been affected, his wife has paid him back for her wrongdoing by virtue of the . . . no alimony agreement, [and] no equitable distribution. She gets nothing from the marriage and she owes him money.

Relying on Marioni[9] for authority, the court concluded:

---

[9] In Marioni, we reversed a Chancery Division judge's fashioning of an equitable remedy after a five-day trial because the "judge's final adjustment required plaintiff to pay an entrepreneurial profit inconsistent with the interloper's position as a constructive trustee." 417 N.J. Super. at 272. However,

> [I]t does seem to me that . . . plaintiff is entitled to [s]ummary [j]udgment, and I do grant it. I do rely on the broad equitable powers of the [c]ourt to address particular circumstances of a given case . . . .
>
> . . . [There is] no question the property is encumbered to the extent Adele['s] . . . legal interest in the property was subject to the mortgage that she signed. And I do find that [John's] interest is likewise subordinate to that of the mortgage holder.

After the court granted plaintiff summary judgment and struck John's pleadings, plaintiff moved for final judgment of foreclosure, which was granted on July 17, 2017.[10] This appeal followed.

We review a grant of summary judgment applying the same standard used by the trial court. Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is

---

our standard of review of the judge's decision "in fashioning an appropriate equitable remedy to fit the particular circumstances" was "abuse of discretion," id. at 275, whereas our standard of review on a summary judgment motion is de novo.

[10] Subsequently, John moved for a stay of the court's decision pending appeal, which was granted on December 15, 2017.

entitled to a judgment as a matter of law, summary judgment must be granted.

[Ibid. (citation omitted) (quoting R. 4:46-2(c)).]

"An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). "The practical effect of [Rule 4:46-2(c)] is that neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).

If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law." DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial court's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013). "[F]or mixed questions of law and fact, [we] give[] deference . . . to the supported factual findings of the trial court, but review[] de novo the [trial] court's application of any legal rules to such factual findings." State v. Pierre, 223 N.J. 560, 577

(2015) (first and fourth alteration in original) (quoting State v. Harris, 181 N.J. 391, 416 (2004)).

To obtain relief in a mortgage foreclosure action, the mortgagee must establish by a preponderance of the evidence that (1) the mortgage and loan documents are valid; (2) the mortgage loan is in default; and (3) it has a contractual right to foreclose upon the mortgaged premises in light of the default. See Great Falls Bank v. Pardo, 263 N.J. Super. 388, 394 (Ch. Div. 1993), aff'd, 273 N.J. Super. 542 (App. Div. 1994). John argues there are material disputed facts regarding the validity of the mortgage, whether he ratified an invalid mortgage, whether an equitable mortgage was created, and whether Adele was John's duly authorized agent. According to John, the competent evidential materials presented, when viewed in the light most favorable to him, demonstrated disputed facts sufficient to withstand summary judgment.[11] We agree.

---

[11] In its response brief, plaintiff argues John's "[b]rief and [a]ppendix are primarily comprised of evidence and arguments that were never presented to the trial court . . . and, therefore, did not constitute part of the record on appeal." On appeal, "appellate courts will not ordinarily consider evidentiary material which is not in the record below." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 2:5-4 (2019). However, "the issues here do not involve the receipt of evidence . . . ." Atl. Emp'rs Ins. Co. v. Chartwell Manor Sch., 280 N.J. Super. 457, 467 (App. Div. 1995). Rather, the legal issues presented in this

"An equitable mortgage is created by agreement of the parties." <u>Reibman v. Myers</u>, 451 N.J. Super. 32, 48 (App. Div. 2017).

> If a deed or contract, lacking the characteristics of a common-law mortgage, is used for the purpose of pledging real property, or some interest therein, as security for a debt or obligation, and with the intention that it shall have effect as a mortgage, equity will give effect to the intention of the parties. Such is an equitable mortgage.
>
> [<u>J. W. Pierson Co. v. Freeman</u>, 113 N.J. Eq. 268, 270-71 (E. & A. 1933).]

"Express words are not necessary to create an equitable mortgage; however, it must be clearly apparent from the instrument or surrounding circumstances, that the maker of the instrument intended the property to be security for the obligation." <u>Reibman</u>, 451 N.J. Super. at 49. "When a guarantor

---

foreclosure action are "based upon all of the documentary proofs, including the pleadings before the trial [court]." <u>Ibid.</u> (citing <u>R.</u> 4:46-2). The documentary proofs that are the subject of plaintiff's objection were clearly before the court as a result of the court's discovery orders and are therefore properly before us on appeal. While plaintiff is correct that we will not ordinarily consider an issue raised for the first time on appeal unless it relates to the trial court's jurisdiction or matters of great public interest, <u>see</u> <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234 (1973), because the dispositive issue before the trial court dealt with plaintiff's right to foreclose on the property, "we need not get caught up in the question concerning the extent to which [John] ha[s] shifted gears or changed [his] position" regarding the propriety of the foreclosure and "we will consider the . . . issues as presented to us, regardless of whether [John's] principal theory has changed." <u>Docteroff v. Barra Corp. of Am., Inc.</u>, 282 N.J. Super. 230, 237 (App. Div. 1995).

A-5689-16T1

takes property as security for his or her guaranty, an equitable mortgage is created." Ibid. (citing Zaman, 219 N.J. at 216-17.)

In Zaman, our Supreme Court identified eight factors to assist courts in determining whether the parties created an equitable mortgage. Those factors include:

> [(1)] Statements by the homeowner or representations by the purchaser indicating an intention that the homeowner continue ownership; [(2)] A substantial disparity between the value received by the homeowner and the actual value of the property; [(3)] Existence of an option to repurchase; [(4)] The homeowner's continued possession of the property; [(5)] The homeowner's continuing duty to bear ownership responsibilities, such as paying real estate taxes or performing property maintenance; [(6)] Disparity in bargaining power and sophistication, including the homeowner's lack of representation by counsel; [(7)] Evidence showing an irregular purchase process, including the fact that the property was not listed for sale or that the parties did not conduct an appraisal or investigate title; [(8)] Financial distress of the homeowner, including the imminence of foreclosure and prior unsuccessful attempts to obtain loans.
>
> [219 N.J. at 218 (alterations in original) (quoting O'Brien v. Cleveland, 423 B.R. 477, 491 (Bankr. D.N.J. 2010)).]

Even a mortgage that is deemed void ab initio by an unauthorized transaction may be ratified. When a party ratifies an obligation to which he possessed a valid defense, the obligation will be given effect as if originally

authorized by that party. <u>Martin Glennon, Inc. v. First Fidelity Bank, N.A.</u>, 279 N.J. Super. 48, 60 (App. Div. 1995). However, ratification requires an "intent to ratify plus full knowledge of all the material facts" and "may be express or implied[.]" <u>Thermo Contracting Corp. v. Bank of N.J.</u>, 69 N.J. 352, 361 (1976). "The intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it." <u>Reibman</u>, 451 N.J. Super. at 50 (citing <u>Citizens First Nat'l Bank v. Bluh</u>, 281 N.J. Super. 86, 98 (App. Div. 1995)). "However, in most cases, the silence or inaction of a principal will not ratify the agent's unauthorized act unless it is clear that the principal was fully informed of what the agent did." <u>Ibid.</u>

> [W]here the silence of a principal may cause loss to a third person, or give him an advantage, he must, without unreasonable delay after the fact comes to his knowledge that his agent has exceeded his authority, disown his agent's act and afford the other party an opportunity to protect himself, or he will make his agent's act his own.
>
> [<u>Bluh</u>, 281 N.J. Super. at 99 (quoting <u>Chetwood v. Berrian</u>, 39 N.J. Eq. 203, 210 (Ch. 1884)).]

Even in the case of a husband and a wife, "it is the general principle that the wife is the agent of her husband only by virtue of his authority expressly conferred or reasonably to be implied from the circumstances." <u>Smedley v. Sweeten</u>, 11 N.J. Super. 39, 41 (App. Div. 1950).

Here, the court made legal conclusions and granted summary judgment despite the presence of disputed material facts underlying those determinations. Notably, the court determined that John was unable to demonstrate that the money was spent on anything other than family-related expenses to dispute the fact that he was an equitable mortgagor who reaped the benefits of the subject mortgage. However, the only evidence that the money was spent on family-related expenses came from Adele's deposition testimony, which the court expressly rejected. On the other hand, Saccomanno's report demonstrated that Adele had misappropriated over $66,000 annually in excess funds after paying lifestyle expenses. Moreover, the court explicitly acknowledged John's substantial earnings, from which an inference could be drawn that his earnings adequately supported the family's lifestyle. "On a motion for summary judgment the court must grant all the favorable inferences to the non-movant." Brill, 142 N.J. at 536.

Further, although the court did not rely on the Equifax reinvestigation report to demonstrate that John had inquiry notice of the subject mortgage dating back to 2009, the court tacitly acknowledged its difficulty believing that John, an intelligent man who held high-powered positions, never checked his mortgage statements for over twenty years. However, a summary judgment

motion does not present an opportunity for the court to weigh the evidence or make credibility findings. Id. at 540 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

Moreover, John's deposition testimony disputed the court's impression that he never checked his mortgage statements for over twenty years. On the contrary, John testified that Adele provided him with fake documents when he inquired and presented him with impostors to explain any discrepancies. Additionally, while acknowledging that a mortgage signed by a power of attorney was aberrational, the court failed to address the factual disputes surrounding the validity of a mortgage created with purported forged signatures and a forged power of attorney, as well as the scope of authority John conferred upon Adele to act as his agent and John's knowledge of Adele's actions to support a finding that he ratified her unauthorized acts.

The court also relied heavily on its determination that John was made financially whole by virtue of the terms of the MSA. However, that too was disputed by John, who testified at his deposition that he had made significant concessions in negotiating the MSA, including assuming a significant amount of credit card debt Adele incurred in his name without his knowledge or consent.

In addition, Adele's fifty percent interest in the property that was conveyed to John under the MSA was subject to plaintiff's lien.

On a motion for summary judgment, "[i]t [is] not the court's function to weigh the evidence and determine the outcome but only to decide if a material dispute of fact existed." Parks v. Rogers, 176 N.J. 491, 502 (2003) (quoting Gilhooley v. Cty. of Union, 164 N.J. 533, 545 (2000)). The presence of a genuine issue of material fact precludes summary judgment. Brill, 142 N.J. at 540. Here, the presence of multiple disputed material facts sufficed to withstand summary judgment. Accordingly, we reverse the grant of summary judgment, vacate the final judgment of foreclosure, and remand the matter for further proceedings consistent with this opinion.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5689-16T1